Good morning. My name is Steve Mackey. I represent Robert Sumpter in this matter. With regard to the standing issue, the ruling by the district court came as a oh, excuse me, I wanted to reserve five minutes. Can I do that at this point? You have a clock in front of you. And when that clock gets to five minutes, you can stop talking. I got you. It came as a surprise to all of us. No one had argued that issue in the district court. But whether or not Mr. Sumpter has standing, we feel is really kind of a slam dunk, I think, as someone used that word a little while ago. First of all, Mr. Sumpter has two allowed class four unsecured claims. They have not been paid. And that is not disputed by the other side. Secondly, Mr. Sumpter has in a timely manner filed his claims, his objections, and his appeals. That is not disputed. The majority of Mr. Sumpter's class four claims is for wages, some $397,000. There's an additional component to his claims of $250,000 arising out of the rejection of his membership agreement. The plan itself does not, in our opinion, comply with section 1123A4 that requires that all. You want to address equitable mootness? Pardon me? You want to address equitable mootness? Yeah, I'll move on to equitable mootness. I think that's a prior question. It sounds to me like you were getting into the merits of the claim. And if the claim is equitably moot and we don't get to the – Yeah. It's an ordering question, but it's an important ordering question. Okay, yeah. Well, the – I mean, you're trying to – your clients in order to prevail would undo the plan, right? No. We are different from Mr. Blixeth. All we want is for Mr. Sumpter to be paid. All it will take – Well, where does the money come from? It will come from Cross Harbor and its affiliate. That they had put – Everything is connected to everything else. This is a plan. You say – you know, you started arguing about how the plan is bad for various reasons. And for you to make that argument, I mean, essentially you'd be asking us to undo the plan. You know, the thing you started talking about is, you know, here's why the plan is bad. And once you started talking about that, you – The plan provides that Cross Harbor and its affiliate will provide $15 million to pay the – Up to. Up to $15 million, yes. And that's because the claims would be up to $15 million. If the claims only total $12 million, then – We know what up to means. Okay, well – It's simple English. In any event, Mr. Sumpter is one of a handful of members of Class 4 that have not been paid. Scores, if not hundreds of other creditors in Class 4 have been paid. And Mr. Sumpter, whose claim is in Class 4 and that's not disputed, has not been paid. Both of his claims? Pardon me? Both of his claims? Both of them. Neither of his claims – As I understand it, you're contending that the wage claim is similar enough to what was paid. Well, so is the contract rejection claim. I mean, they're both Class 4 – they're both in Class 4. But the $15 million was for a certain category of claims, right? For a trade credit claim? It was for trade creditor. It was for people that were designated as trade creditors. They were not designated in the plan. They were designated by the committee or something. They were designated by the Unsecured Creditors Committee and then paid by the affiliate. Although, I will mention – So one percent of your complaint is that he wasn't designated. Yes. Well, also – but the Court needs to remember that there were claims that were not nominated, if you will, by the Unsecured Creditors Committee, that the cross-harbor went ahead and paid. Eric Ladd was – and the sales staff – Out of the same fund? Yes. They just upped the amount of money in the fund? No. No. It was within the $15 million. It was $15 million, but it wasn't – but it was, again, up to $15 million. So they upped what they were otherwise funding the fund with. Yes. They would fund the plan with up to $15 million in terms of how much it would take to pay people that were designated as members of the trade creditor. The district judge here actually held that you didn't have appellate standing. Is that right? Yes. And you sort of skipped that on the theory that it's not tolerable? Well, I thought – no, no. I – no. He did have appellate standing. He was a creditor. That's what I meant, that it's not worth talking about because it's obviously not so. It's what you're saying, essentially, that he had appellate standing because he essentially was after some money. Yes. He was a creditor. Well, yes, although there's a reasonable chance that he may not get any money at all. I mean, we don't know what the outcome of all that litigation is going to be against Mr. Blitzeth. You've talked about the fact that here we are five years later and what's going on. Five years later, my client hasn't received a nickel. Let me just ask you a question about the wage claim, for example. Sure. You settled the amount of that claim, correct? Yes. The value of that claim. Yes. The amount. The amount. The valuation of the claim. And then you went to the district – to the bankruptcy judge and had it approved, right? We had to have it approved, yes. So why didn't you raise the whole business about not getting paid? The priority. Because that was before the district court reversed and remanded it. Well, was the third amended plan already in existence at that time? Yes. The third amended plan was. Well, you knew. You knew how he was going to be paid, right? Yes. Well, no. We knew he was going to be paid by the trade creditor fund, okay, or that he was – excuse me. We knew that he was in class four. You knew he was a class four creditor. You knew the trade creditor's fund was in existence or was going to be funded. Well, it had already been funded, I think. So why didn't you ask the bankruptcy court to put you into that category when you settled the claim, when you went to the bankruptcy court for approval? Because it wasn't up to the bankruptcy court to do. But you raise a really good question. If you look at the settlement with Mr. Hingle on that, it says specifically right in there, the liquidating trust, that was the party we settled with, does not oppose Mr. Sumter being paid out of the trade creditor fund. It's right in there. And that's what Judge Persher approved. So, I mean, it's black and white. It's a sentence. Let's see. I have a similar question with respect to the membership or the contract membership claim. Wasn't that also the same? I mean, that case was litigated, right? That was litigated all the way. In fact, it was appealed in the Ninth Circuit. Why wasn't the issue raised there? Well, that was just a valuation issue. I mean, all we were doing was arguing over whether or not the rejection was. . . Was there anything that prevented you from raising the right or the possibility of being included in the trade creditors group? Yeah, it wasn't within the scope of the issue. I mean, the only. . . Judge Persher had made a ruling on summary judgment regarding the value of the claim, saying it was $250,000. And that was. . . Class four? Yes. Yeah. I don't think it was ever disputed. It was in class four. You couldn't say, well, we want to be treated? We want to be paid along with the other folks? We already had a stipulation of that effect on the record. As a trade creditor, Glenn? Yeah, the liquidating trust wouldn't oppose us filing as a trade creditor. And it was the liquidating trust that was involved in that appeal. Is your ultimate problem, at least with respect to the wage claim, is that the creditors committee didn't put you in the trade creditors fund, although it could have? Is that your ultimate problem? That's part of it. There were people that were paid out of the trade creditors fund that were not nominated by the unsecured creditors committee. So to the extent they say, well, there's no unsecured creditors committee or the unsecured creditors committee didn't nominate you, that's belied by the facts of the case. Harry Cladd was paid afterwards. We've cited that. And about a half a dozen sales. I know what Judge Hens said about all this. What does Judge Kirschner say about all this? About what? About your contention that you should have been, that there was a problem with your not being paid out of the trade creditors fund. That was raised and that was litigated at the June 11, 2000, excuse me, the July 2011 hearing. And he said, specifically he said, well, Mr. Sumter doesn't need to worry about not being in the trade creditor fund because he's going to be paid when they make their recovery against Mr. Blixeth. And here we are, four years after, three years after that, and there's no recovery against Mr. Blixeth. We don't know if there ever will be. Thank you. Thank you. Thank you. May it please the Court, I'm Michael Blastowski of the law firm Duane Morris LLP, here on behalf of the Appley New CHYMC Acquisition LLC. That is the entity that acquired the Yellowstone Club in the context of the plan of reorganization. Is there any reason you couldn't just pay these claims? Well, we're free to do with our money with what we wish. There's nothing in the plan that prohibits us from making a payment, just like we could pay somebody outside of a plan. But the plan had a very special structure and process for paying these so-called trade creditor claims. Understand, my client purchased the club. The club had happened in Chapter 11 in the middle of the recession. There were trade creditors who were unpaid. These were members of the local community who would help construct that club and whose work was necessary to complete that construction. So in order to rescue, augment, preserve, whatever goodwill existed, this trade creditor fund was created. So Sumster didn't have so much goodwill. Correct. Why bother buying him off? He was a high-level employee of Mr. Blixeth's. He was not what we deemed to be a trade creditor. If you look at the plan, it talks about the creation of the fund, and although my client was defunded up to $15 million, we were not the entity which designated who would be paid. Instead, the designating party was the Official Committee of Unsecured Creditors, a statutorily created committee designated by the Office of the United States Trustee with a fiduciary duty to the creditor body. They insisted on doing the designation. We agreed to that. It is in the plan. And as the plan states, that they would designate claims as deemed necessary and appropriate to preserve and enhance the reputation and good standing of the reorganized debtors and in recognition of the sacrifice and hardships endured by such creditors as a result of the financial problems of the Yellowstone Club. That was the process that was put in place. It was well known to Mr. Sumster. It was well known to all the creditors. The first plan was confirmed on June 26, 2009. Mr. Sumster didn't say a peep about this trade creditor fund until two years later when we had a hearing on remand after which Judge Kershaw eventually ratified his earlier confirmation order. He had filed his wage claim long before the first confirmation hearing. In connection with the confirmation hearing of the second amended plan, his membership contract was rejected, his two claims, wages and the membership. He had filed an objection to the rejection. He didn't appear at the hearing. The order was entered. He wanted that reconsidered. He was invited to come to the confirmation hearing on the third amended plan, which was the main event underlying all of this, and all he was focused on was whether his contract should be assumed or rejected. He didn't mention anything about the trade creditor fund or any designations. The plan was confirmed. Was there an opportunity for him to dissent? Yeah. Well, he could have raised a confirmation objection, which he never did, and there were later opportunities as well. The plan went effective on June 26, 2009. It was confirmed to that date. It became effective in July of 2009. What that means is all of the financial transactions, real estate transactions contemplated by the plan were completed by that date. Within 60 days after that, the official committee of unsecured creditors was dissolved. The committees don't remain forever. They're really there for the bankruptcy process. While the committee was still active, it designated these trade creditors, and it didn't do so, and it sought court approval of its designations. And Mr. Sumter never objected to any of these designations. And you may hear a rebuttal, oh, certain people shouldn't have been paid, they weren't true trade creditors. There was an opportunity to object to that, and he never did that. He may do it now, but the time is long past. Now, and he also mentions a Mr. Ladd, the people were paid who weren't designated by the committee. We laid this out in our brief, and I think it's worth repeating. The committee had this window between the effective date and dissolution to designate creditors. And what they did is they designated among those creditors a category of creditors, and those were the sales staff of the real estate office that had sold Billistown Club properties and which presumably would continue to do so once the club was back on its feet. After making that categorical designation, they identified specific individuals, and they filed their motion. But then it turned out that Mr. Ladd had been omitted, and an ad hoc group of the committee members on the road said let's add him to the list. Notice was given, and he was approved. All right. Here's the question, or here's my question. Given all this, what is your, on what legal basis do you want us to rule? I gather that the district court said standing. Are you supporting that? Are you saying equitable movements? Are you saying the merits? What are you saying? I think the district court. Collateral estoppel? Equitable mootness. And I'll continue along those lines. I'd like to think that the district court reached the right result perhaps for not the best reason. But equitable mootness, I mean, here we're talking about paying, you know, I don't know, $600,000 or something. It's not like that's going to upset anything. Well, but again, there was a process in place that was, you know, part of the settlement term sheet. The settlement term sheet had three parties. It was credit suites, the prepetition lender, the acquirer, my client, and the official committee of unsecured creditors. But it seems that you're more arguing either an estoppel and not an equitable. Well, you're right. Because in terms of equitable mootness, as I understand, the notion of equitable mootness is it's just a huge mess, we couldn't do it. That's not true. You could do it. Well, yes. But the question is whether you can really fashion effective relief. And our argument would be. Just pay the $600,000. Because you said can we pay them? Well, sure. I could pay them. The question is there was a procedure set up, and Mr. Sumter sat by and just watched it proceed and then almost. It was a collateral estoppel. Yeah. Well, a collateral estoppel. Exactly. Because once this process had been exhausted. Right. Then he settles his wage claim. You're making an estoppel claim, but you're not making an equitable mootness claim. I may not be succeeding, but I'm making it. But after this process is completed, he enters into a stipulation. And he agrees to the amount of his claim and the treatment of his claim. He's in Class 4. And by that time, he knows the committee's dissolved, that this process is concluded, and it's too late for him to be designated as a trade creditor. Now, he tries to find. So it sounds like he wants to rule and say all that. Yeah. But not that he wants to say that this whole thing, we just can't rule on anything because everything's by the boards. Well, we'd be very happy if you ruled on an estoppel basis. But in any event, so he enters into the stipulation and takes some comfort from the fact that the liquidation trust says, we have no objection to your being designated as a trade creditor. Well, that's fine, but they weren't the ones that did the designations. It was the Official Committee of Unsecured Creditors. So they may have thrown that in as a gimme in the context of the stipulation, but it has no bearing whatsoever. Is he aware of his notion that this was all an invalid provision? Well, his argument is unfair discrimination among members of the class. And I guess we would have two responses to that. There's a good business reason for discrimination, as we would say existed here, where you have trade creditors as opposed to general unsecured creditors. Is that allowed? Or do you have to create a different class? Or you're saying they functionally create a different class? It would have been better to create two different classes. And I think the way the plan balloting had turned out, the plan would have been confirmed anyhow. But you also got the sales staff, right? I'm sorry? The sales staff. You've also got the sales staff. Well, they were included among the trade creditors, yeah. Well, you treat them as trade – you call them trade creditors, but they're really not trade creditors. They're employees like Mr. Sumter. So that sort of undermines your rationale for saying, oh, well, we had different classes. Forgive me, Your Honor. The fact is you didn't have different classes. You have a mishmash. The sales staff was not the sales staff of the debtor. They were the sales staff of a related party. In other words, they weren't employees. I mean, they weren't – not like Mr. Sumter. They were salespeople of a related entity. I can't hear you through it. They were sales staff of a related entity. That makes it worse. I'm sorry? That makes it worse, not better. Well, no, no, because the thing is you have a broad rubric of trade creditors. Look at these people. Whose goodwill is it necessary, really, to proceed forward to ensure the continued success of the club? You know, you don't want people in a small community who have rented services and who haven't gotten paid to be embittered about it and to be very sour about the club. But it seems like this whole system was set up to discriminate. The whole thing was that this committee was going to decide who among the Class 4 creditors who was going to get paid because we like them better. Well, I'd like to think it wasn't as arbitrary as that. But in any event, it was decided in 2009, and Mr. Sumter didn't say anything. And he settled his claim. He didn't say anything. And the only thing he was concerned about in the plan was rejection of his membership, which went all the way up to this Court, two separate appeals, one on the substantive issue of rejection, and he lost on that, and then the valuation of his claim. Then Judge Haddon, we have our hearing beforehand where Mr. Lixith had a blunderbuss of issues, and Judge Haddon orders a remand on the issue of whether appropriate notice was given in the 1919 settlement, exculpation in good faith. And then suddenly Mr. Sumter raises these issues for the first time long after this project was completed. Well, the reason, obviously, is because, I mean, maybe he thought at the beginning that maybe he would get paid promptly, and now it's two years later and he hasn't gotten paid. Well, I think the law puts a burden on him if he thinks the process is improper to raise the question there. He had to have an outstanding two years before. Well, as opposed to saying, well, I'll see whether I'm designated or not, and then I'll make my decision as to whether to complain. As a creditor of the case, he could have filed an objection in June of 2009. Okay. Thank you. Thank you. I don't believe we have any time left. Would you like to take a minute for rebuttal? I'm sorry? Did you want to take a minute for rebuttal? The comment that the trade creditors were local merchants and so forth is really not completely true. It involved, as you noted, Mr. Ladd, who was a salesperson, and then sales staff who were with, he says, another company, but it was a captured company. They sold the property at the Yellowstone Club. That's all they did. But on the creditors' committee was a man by the name of Phil Griffin. Phil Griffin was the senior vice president of the club, just like Mr. Sumter was. Mr. Griffin got paid. Mr. Sumter didn't. Mr. Griffin had lived in South Carolina by that time. He was not a local trade creditor, but he got paid. And Eric Ladd, not a trade creditor, but he got paid. All their comment about what we did or did not raise at the June 9th, or excuse me, the June hearing in 2009, needs to be addressed in the context of the fact that that's the hearing which the judge hadn't held, we didn't get adequate notice of. The third amended plan and the settlement term sheet were only filed like three days before June 2nd. Did the second amended plan on this point? Pardon me? Did it differ on this point from the second amended plan? Yes. It did as to the amount. Oh, yeah, it differed as to the amount, and it differed as to another matter which is real critical, and that is that what the third amended plan did that no previous plan had was it said that when Cross Harbor pays some of those claims and buys them, it then goes into Class 4 as a sort of a super class for a priority. They have to be paid back all the money they paid out before any remaining creditors like Mr. Sumter gets paid anything. And, you know, on the issue of equitable mootness, we feel that this is just like the Thorpe case. Thank you. Thank you. Bye. Mr. Sarai, you will stand submitted. We'll take a short break before the last case on the calendar.
judges: KOZINSKI, PAEZ, BERZON